UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-22115-CIV-MORENO/O'SULLIVAN

MIGUEL ALCARAS and BERETTA
BOATS, LTD.,

      Plaintiffs,


v.

HATTERAS YACHTS, INC.,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

      THIS MATTER comes before the Court on Hatteras's Motion for Summary

Judgment (DE# 23, 9/26/14). This matter was referred to the undersigned pursuant to

28 U.S.C. § 636(b) for a report and recommendation. See Order of Referral to

Magistrate Judge O'Sullivan for All Pretrial Proceedings (DE# 30, 10/14/14). Having

reviewed the applicable filings and the law and having held a hearing on November 4,

2014, the undersigned respectfully RECOMMENDS that Hatteras's Motion for

Summary Judgment (DE# 23, 9/26/14) be **GRANTED in part and DENIED in part** for

the reasons stated herein.

## BACKGROUND[1]

      On May 7, 2014, Miguel Alcaras and Beretta Boat, Ltd. (collectively, "plaintiffs")

filed the instant action in the Circuit Court of the Eleventh Judicial Circuit in and for

---

[1] Some of the documents filed by the parties contain multiple page numbers. To avoid confusion, the undersigned will use the page numbers automatically assigned by the Court's CM/ECF system, which appear on the upper right hand corner of each document, when citing to the record.

Miami-Dade County, Florida. See Complaint (DE# 1-2, 6/6/14). The complaint alleged

three causes of action against defendant Hatteras Yachts, Inc. (hereinafter "Hatteras"

or "defendant"): breach of contract (Count I), breach of implied covenant of good faith

and fair dealing (Count II) and unjust enrichment (Count III). Id. On June 6, 2014, the

defendant removed the instant action to the United States District Court for the

Southern District of Florida pursuant to 28 U.S.C. §§ 1332(a) and 1441 based on

diversity jurisdiction where it remains pending. See Petition for Removal (DE# 1,

6/6/14).

On September 26, 2014, the defendant moved for summary judgment in its favor

on all three counts of the complaint and filed a statement of undisputed facts. See

Hatteras's Motion for Summary Judgment (DE# 23, 9/26/14); Hatteras's Statement of

Undisputed Material Facts (DE# 24, 9/26/14). The plaintiffs filed their corrected

response in opposition to the instant motion on October 15, 2014. See Plaintiffs'

Corrected and Amended Response to Defendant's Motion for Summary Judgment

(DE# 32, 10/15/14); Plaintiffs' Response to Defendant's Statement of Undisputed Facts

(DE# 29, 10/14/14). The defendant filed its reply on October 24, 2014. See Reply Brief

in Support of Hatteras's Motion for Summary Judgment (DE# 40, 10/24/14). The

undersigned held a hearing on the instant motion on November 4, 2014.

In the interim, the Court held a hearing on October 27, 2014 after which it

allowed the parties to file legal memoranda concerning the admissibility of parol

evidence. See Omnibus Order (DE# 42, 10/27/14). Pursuant to the Court's Order (DE#

42), the parties filed Plaintiffs' Motion in Limine to Admit Parol Evidence at Trial (DE#

44, 10/30/14), the Defendant's Brief Concerning the Issue of Ambiguity and Parol

Evidence (DE# 48, 11/3/14) and Plaintiffs' Reply in Support of Motion in Limine to Admit

Parol Evidence at Trial (DE# 51, 11/12/14). The undersigned issued a ruling on the

parol evidence issue in a separate Order. See Order (DE# 53, 11/25/14). Hatteras's

Motion for Summary Judgment (DE# 23, 9/26/14) is ripe for consideration.

## FACTS[2]

Plaintiff Miguel Alcaras (hereinafter "Alcaras") is a Venezuelan boat builder.

Plaintiff Beretta Boats, Ltd. (hereinafter "Beretta") is a British Virgin Islands entity

formed by Alcaras to purchase boats.[3] Defendant Hatteras is a yacht manufacturer

headquartered in New Bern, North Carolina. Non-party Yachtcenter, S.A. (hereinafter

"Yachtcenter") is Hatteras's Venezuelan dealer.

**A.      Alcaras's Purchase of the 60C and Dissatisfaction with the Vessel**

In 2009, Alcaras (through Beretta) purchased a 60-foot convertible yacht

(hereinafter the "60C") from Hatteras for $2,878,801.56. Alcaras paid a portion of the

60C's purchase price in cash and financed the remainder through a loan from Mercantil

Commercebank, N.A. (hereinafter "Mercantil Commercebank") in Miami, Florida. Within

weeks of this purchase, Alcaras complained to Hatteras about the 60C's performance.

---

[2] The facts recited in this section are taken from the relevant paragraphs in Hatteras's Statement of Undisputed Material Facts (DE# 24, 9/26/14) which the plaintiffs do not dispute, or the paragraphs for which the plaintiffs generally deny, but fail to provide record evidence in opposition. See Hawthorne v. Baptist Hosp., Inc., No. 3:08cv154/MCR/MD, 2010 WL 716539, at *3 n.6 (N.D. Fla. Feb. 25, 2010) (stating that "a party may not rest on a general denial to oppose a properly supported motion for summary judgment."). The undersigned has also included the relevant facts contained in the Plaintiffs' Statement of Additional Material Facts (DE# 29 at 7-15, 2/18/14) which the defendant does not dispute where they are supported by record evidence.

[3] As previously noted, Alcaras and Beretta will be collectively referred to as "plaintiffs" in this Report and Recommendation.

Hatteras and Alcaras began negotiating the terms of an arrangement by which Hatteras would either repair the 60C or take the 60C back entirely and replace it with an as-yet-to-be built yacht.

After months of negotiations, Hatteras agreed to take back the 60C and replace it with a custom 60-foot yacht (the "GT60"). Hatteras also agreed to give Alcaras a $200,000 credit for a tower and electronics to be installed on the GT60, a 15% discount on any additional options Alcaras wanted on the GT60 that were not on the original 60C and a promise to reimburse Alcaras for the cost of fuel to transport the completed GT60 from New Bern, North Carolina to Venezuela, Alcaras's residence. Alcaras agreed to provide all specifications for the GT60 to Hatteras by a certain date (later extended multiple times), to pay any additional costs of financing the remaining balance due on the GT60 and to take delivery of the GT60 upon its completion. Hatteras initially estimated that the GT60 would be completed by May 2011. This date was later extended by the parties.

On January 26, 2010, Jim Meyer (hereinafter "Meyer"), Hatteras's then President, sent an email to Alcaras stating:

> We very much look forward to getting this agreement completed and starting your new boat. As you know, **our plan assumed that your bank loan would remain in place, effectively transferring from 60C225 to a factory commitment for a new boat and finally to the new boat itself**. Based on early conversations with Mike Guedez[4] and as indicated in our various communications, we believed that this would not be an issue. **Unfortunately, it has turned out to be a large hurdle and we are currently relying on Mike to find a solution with the bank**.
>
> Because this is taking so long, I suggest that the three of us have a phone

---

[4] Mike Guedez was an employee of Yachtcenter.

4

call either today or tomorrow. I will get this arranged.

January 26, 2010 Email from Meyer (DE# 44-3 at 14, 10/30/14) (emphasis and footnote

added). The following day, January 27, 2010, Meyer sent another email stating:

> **I did speak with Mike [Guedez] today regarding the issue of title transfer and how to keep the original loan intack [sic]. He remains confident that there is a way forward and will travel to Miami at the beginning of next week and meet in person with the bank holding the loan**. We are ready to proceed immediately provided that we can obtain the title for [the 60C] "free and clear" no later than this May.
>
> Mike also discussed an idea which would get you into a new boat by the end of this year. He will talk to you about this while we also consider it.
>
> **Under the assumption that we stay the course and are able to resolve the title transfer issue, I will update our agreement and resubmit this to you**.

January 27, 2010 Email from Meyer (DE# 44-3 at 13, 10/30/14) (emphasis added).

## B.   The Release Contract

The parties memorialized their agreement on February 12, 2010 in a document

entitled "Release and Agreement in Settlement of All Claims" (hereinafter "Release

Contract").[5] See Release Contract (DE# 24-2 at 8-9, 9/26/14). Alcaras and his financial

consultant and advisor, Yovany Rojas (hereinafter "Rojas"), understood and agreed to

everything contained in the Release Contract before signing it.

The Release Contract contained the following relevant provisions:

> WHEREAS, [Alcaras] has agreed to deliver the [60C], with all features originally purchased, and **transfer title free and clear of ~~any~~ *all* liens and encumbrances, *except for [Alcaras's] primary bank loan*,** to [Yachtcenter] within 10 days of the effective date of this agreement.

---

[5] The plaintiffs refer to this document as the "Settlement Agreement" and the defendant refers to it as the "Release Contract." The undersigned will use the term "Release Contract" in this Report and Recommendation.

\*\*\*

[Alcaras] further agrees to indemnify [Hatteras and Yachtcenter] for any unknown liens or encumbrances that are later claimed against [Hatteras] as a result of [Alcaras's] use of the [60C]. [Alcaras] further agrees to **indemnify** [Hatteras and Yachtcenter] for any losses incurred from the failure of [Alcaras] to **promptly and correctly provide and sign off on the [60C's] title**, bill of sale, and any other instruments reasonably requested by [Hatteras and Yachtcenter], as well as any and all costs, including attorney fees, **in obtaining these instruments promptly executed, free and clear of all liens**.

\*\*\*

. . . [Alcaras] will provide specifications for the [GT60] no later than May 31, 2010, and Hatteras will have the [GT60] ready for delivery by May 15, 2011 or as soon thereafter as possible. [Alcaras] . . .  further agrees that he will be responsible for the costs of any additions or modifications to the [GT60] that are not currently on the [60C] at a 15% discount from retail prices. [Hatteras] also **agrees to pay any additional taxes or costs associated with financing** and titles of the [GT60] and will take delivery of the [GT60] in New Bern, North Carolina, USA, upon its completion. Hatteras will cooperate with [Alcaras's] bank, as requested by [Alcaras], to provide information concerning this transaction. If requested by [Alcaras], Hatteras is willing to provide [Alcaras's] bank with a written guarantee to provide the [GT60] in the said timeframe . . . .

Any costs payable by [Alcaras] to Hatteras for additions and modifications will be paid to Hatteras prior to completion and delivery.

\*\*\*

[Yachtcenter] agrees to transport the [60C] to a designated location in Florida, USA, and any expenses incurred will be reimbursed by Hatteras. [Yachtcenter] agrees to take no mark up on the [GT60] or any of its options and/or components and take no sales commission. **[Yachtcenter] will also assist Hatteras in the sale of the [60C] at no cost or commission to [Alcaras] or Hatteras,** other than actual costs, including 3rd party broker fees, associated with the sale of the [60C] which will be reimbursed by Hatteras.

Release Contract (DE# 24-2 at 8-9, 9/26/14) (handwritten alterations represented by

italicized and stricken text; bold emphasis added).

**C.      The Sale of the 60C**

Soon after the parties executed the Release Contract, Alcaras returned the 60C to Yachtcenter. In or around October 2010, Hatteras found a new buyer for the 60C. On October 19, 2010, Karl Kemppainen (hereinafter "Kemppainen"), Hatteras's Vice President of Sales, sent Alcaras an email stating:

> As you may have already heard, we do have a contracted deal on [the 60C] and are moving to close with the customer before month end. **In order for this transaction to successfully complete [sic] in a timely manner, we do need your assistance in signing and providing the required paperwork** to Amalia Noguera, of Marine Documentation, Inc. in Coral Gables, Florida who should be in contact with you directly. Please let her or I know if you have any questions.
>
> We do appreciate your assistance with this transaction and are looking forward to delivering [the GT60].

October 19, 2010 Email from Kemppainen (DE# 24-3 at 14-15, 9/26/14) (emphasis added). On the same day, Alcaras responded as follows: "No problem Karl. **I[']m ready to do everything is [sic] necessary to cooperate**. I already signed the aut[h]orization Amalia sent me today to provide the neces[s]ary documents." October 19, 2010 Email from Alcaras (DE# 24-3 at 14, 9/26/14) (emphasis added).

In order to effectuate the sale of the 60C, Hatteras paid off the remaining loan balance on the 60C of $1,376,262.58 to Mercantil Commercebank. After paying off the loan balance, Hatteras used the excess proceeds from the sale of the 60C as a deposit on Alcaras's account for the GT60. See Deposition of Bob Nenni (DE# 29-1 at 10-11, 10/14/14).

**D.      Alcaras's Failure to Pay for or Take Delivery of the GT60**

The parties extended certain deadlines under the Release Contract including the

delivery date of the GT60. At some point, Alcaras applied for a loan with Mercantil Commercebank to finance the remaining balance on the GT60. Mercantil Commercebank denied the loan application sometime in 2011 because it had discontinued the loan program that had allowed Alcaras to obtain his original loan on the 60C. The denial of this loan application was unrelated to Alcaras's credit worthiness.

After Mercantil Commercebank denied his loan application, Alcaras made telephonic inquiries to two other banks in an attempt to obtain financing. See Deposition of Alcaras (DE# 24-1 at 66, 9/26/14). Neither bank had a loan program that would allow Alcaras to finance the GT60. In addition to the banks, Alcaras worked with a financial entity who "could guaranty the loan with the condition that it would be in [Venezuelan] bolivars." Id. at 67-68. The interest rate on the proposed loan was approximately 12 percent. Id. at 68. However, Alcaras did not proceed with this loan because "the exchange rate they were talking about had a condition, a variable rate during the first years, and that was impossible." Id.

On April 4, 2011, Alcaras, through Rojas, advised Hatteras by email that he wanted to list the GT60 as available for re-sale through Hatteras's dealers worldwide. Alcaras also requested that Hatteras extend the delivery date of the GT60 to October 15, 2011 in order to allow more time for the GT60's re-sale.

On April 12, 2011, Hatteras sent Alcaras a letter. See April 12, 2011 Letter (DE# 24-2 at 13-14, 9/26/14). The letter specifically stated that:

the following will be required:

1. All outstanding specifications to be confirmed within two

weeks from today. We will complete the construction process according to our current production schedule.

2. Once the [GT60] is complete, **we will keep it here at the Hatteras facility until October 15, 2011, without charge**. Periodic washings will be provided by us as a courtesy to you. Whether or not title is transferred at the time of payment (May 15th) or delivery (on or about Oct 15th), is up to you.

3. **In the event that final payment is not made on or before May 15, 2011, you will be considered in default of [the Release Contract]**.

Though this is a highly unusual situation, we are prepared to accommodate your proposal so long as you agree to the terms listed above and understand the negative impact that a further delay or default could have on our business.

Id. at 13 (emphasis added).

On April 27, 2011, Hatteras sent another letter to Alcaras wherein Hatteras agreed to extend certain deadlines including Alcaras's final payment date. See April 27, 2011 Letter (DE# 24-2 at 16-18, 9/26/14). In this letter, Hatteras warned Alcaras that "[i]n the event that final payment [wa]s not made on or before July 15, 2011, [Alcaras would] be in default of the [Release Contract]. Id. at 17. Hatteras requested that Alcaras confirm the terms of the April 27, 2011 letter by signing it and Alcaras signed and returned the letter to Hatteras. Id. at 18.

The GT60 was "substantially completed" in June 2011, although its tower and electronics had not yet been installed. On June 30, 2011, Hatteras spoke by telephone with Rojas. During this telephone call, Rojas requested another extension of the payment deadline because Alcaras had not yet secured a loan for the remaining balance on the GT60. Hatteras requested a $250,000 deposit by July 15, 2011 in order

9

to extend the final payment deadline.

By email dated July 14, 2011, Alcaras rejected the suggestion of paying a deposit, noting that he was "not currently able to do so at this moment, due [to] the facts of my divorce." See July 14, 2011 Email from Alcaras (DE# 24-3 at 32-33, 9/26/14). However, Alcaras did represent that he was still searching for financing and he requested an extension of his payment deadline to August 15, 2011. Id. Hatteras agreed to the extension. Alcaras did not meet the August 15, 2011 deadline.

Ultimately, Alcaras did not obtain financing under the same terms as the original loan on the 60C. He did not pay the remaining balance on the GT60 and did not take delivery of that vessel on the agreed upon date.

On October 3, 2011, Alcaras sent Hatteras an email acknowledging that it had become "necessary" to re-sell the GT60 to a third party, "at [Hatteras's] disposal." October 3, 2011 Email from Alcaras (DE# 24-3 at 35, 9/26/14). In this email, Alcaras acknowledged that he understood he might have to accept a trade of the GT60 "for a boat of less value." Id.

In response to this email, Hatteras sent a letter to Alcaras on October 12, 2011 stating in part: "We are in receipt of your email dated October 3, 2011, requesting that we help facilitate the sale of GT60 position #305, which was built to your specifications pursuant to our agreement." See October 12, 2011 Letter (DE# 24-3 at 37, 9/26/14). The letter also stated: "While we will continue to assist you in efforts to sell the GT60, **it is imperative that the new GT60 be funded before December 15, 2011 or the vessel will be forfeited** to Hatteras." Id. (emphasis added). The letter requested that Alcaras "provide for [Hatteras his] plan, in writing, by October 26, 2011 for funding the

10

balance due of $1,342,474, in the event that [Alcaras's] GT60 is unable to be sold and delivered prior to December 15, 2011." Id. at 38.  Alcaras responded by email on October 18, 2011 stating in part:

> The balance payment deadline extension for the GT60 has been motivated by these reasons which are beyond my power, so, I suggested among other solutions we jointly explore the possibility of receiving a ship of less value for the credit amount that I have with you. Similarly, the possibility that the ship is sold to a third party to resolve the problem.
>
> I appreciate that you have taken the sale of the GT60 through your network of representatives and the collaboration of Yacht[c]enter.
>
> I am willing to consider the sale of the GT60 and as payment I can receive a vessel of less value if the terms are acceptable, also to help conclude this matter.
>
> However, ***the solution of our arrangement should be a joint solution,*** and I am willing to participate in good faith in any other suggestions you have.
>
> I would like to remind you that I have suffered economic losses, paying the loan and not enjoying a boat for more than eight months, further more when I was financially comfortable to do so because I have a long term loan.
>
> Finally, I must remind you that the balance mentioned in your letter has not been accepted by me, and discrepancies about this matter have been communicated to you in the past.

 October 18, 2011 Email from Alcaras (DE# 24-3 at 41-42, 9/26/14) (emphasis in original).

On December 12, 2011, Hatteras sent a letter to Alcaras stating in part that:

> unless [Alcaras] fund[ed] the current balance due on the GT60 ($1,342,474) on or before December 15, 2011, Hatteras [would] take immediate steps to sell the GT60 as it best s[aw] fit, in its sole discretion. Hatteras [would] notify [Alcaras] promptly of any such sale, and if Hatteras [wa]s able to obtain a sale price that exceed[ed] the balance due, Hatteras [would] reimburse [Alcaras] the difference, less any costs that [were] incurred to store, maintain, and dispose of the GT60.

December 12, 2011 Letter (DE# 24-3 at 44, 9/26/14). Alcaras failed to pay Hatteras any amount by the December 15, 2011 deadline.

**E.      The Sale of the GT60 and Acquisition of the Azimut**

Hatteras and Yachtcenter immediately began seeking a new buyer for the GT60, which was still in its substantially completed state and was costing Hatteras thousands of dollars every month to maintain in saleable condition.[6]

In March 2012, Hatteras learned from Yachtcenter that a customer had expressed interest in purchasing the GT60 in exchange for some amount in cash and a trade-in 50-foot Azimut yacht (hereinafter the "Azimut").

On March 5, 2012, Hatteras sent an email to Alcaras concerning the potential sale of the GT60. See March 5, 2012 Email (DE# 29-2 at 35, 10/14/14). The email explained that:

> The deal would be structured so that [Hatteras] would receive a cash portion that would cover the funds [Hatteras is] entitled to and you would receive [the Azimut] that you would own free and clear to either keep or sell at your convenience to recapture your remaining equity. **The retail value of this boat could be in the range of $700,000 to $900,000 depending on the situation**.
>
> In order for this to work, you would need to officially agree that the structured settlement with your receiving the Azimut trade in as total equity settlement for the closing of the GT60, completely resolving the situation and all parts of [the Release Contract]. **If not, we would continue to look for other opportunities to try and close out this situation in a different manner**.
>
> If you are in agreement and willing to consider such an arrangement, we

_____

[6] The plaintiffs deny any responsibility for the maintenance expenses incurred by Hatteras.

will take the next steps to try and structure a deal with the customer.

Id. (emphasis added).

In an email the following day, Hatteras wrote:

Mr. Alcaras,

The boat is to be in extremely good condition with 200+ hours and **customer believes the boat is worth $1,000,000**. Given this and the sales commission that needs to be paid in the process of selling the boat, **this deal has a value close to $2.5M** which is what these boats are selling for at retail. We will be fortunate to net out a similar cash offer. Please keep in mind that market values have changed significantly in the past few years.

**If you are not interested in considering this arrangement, we will continue to look for other opportunities**.

March 6, 2012 Email (DE# 29-2 at 33, 10/14/14) (emphasis added).

On March 7, 2012, Alcaras responded that he "could accept the Azimut . . . and $600,000.00 to close the deal. In trying to sell this boat in Venezuela does not get much [sic] because of its quality. Ask the buyer please." March 7, 2012 Email from Alcaras (DE# 29-2 at 33, 10/14/14). Hatteras responded that "With this deal there is no opportunity for you to receive the trade plus any amount of cash." See March 9, 2012 Email from Hatteras (DE# 29-2 at 32, 10/14/14). Hatteras further stated: "In the spirit of cooperation and because this transaction involves a trade, we are seeking your participation and approval, but that is not necessary. The next opportunity may not be as favorable." Id. at 33.

In August 2012, though Yachtcenter, Hatteras unilaterally sold the GT60 without Alcaras's approval. The new buyer paid $1,600,000 million in cash plus the Azimut. Yachtcenter received a commission in the amount of $225,000 in connection with the

13

sale of the GT60. Hatteras did not tell Alcaras about the sale of the GT until

approximately two months later on October 25, 2012 when Hatteras sent a letter to

Alcaras stating:

> I am pleased to inform you that Hatteras has reached [an] agreement to sell the GT60 to another party through a Hatteras dealer. The agreed upon sale price, net of dealer commission, is $1,375,000, plus the trade-in of the [Azimut]. This amount exceeds the net remaining balance due from you on the GT60 of $1,355,755.30 (which includes the care, maintenance and interest expense incurred by Hatteras on the GT60 since August 15, 2011 when you did not make timely payment and take delivery). Consistent with our previous correspondence and agreements, Hatteras intends to pay you the difference between the proceeds from this sale and the remaining balance due from you, less the dealer's commission and other amounts Hatteras incurred facilitating the sale, maintaining, storing and caring for the GT60 from August 15, 2011 through delivery to the new buyer. Hatteras will also credit you $200,000 for electronics and tower, offset by additional options to the GT60 to facilitate the sale. Thus, Hatteras currently expects that you will receive a total of $72,724.22 once this sale closes. The final numbers are outlined in the attached document.
>
> Additionally, since the Azimut is part of the consideration provided by the buyer for the purchase, any proceeds from sale of the Azimut will be for your benefit and transferred directly to you. Hatteras will transfer ownership of the Azimut to its dealer Yachtcenter who has agreed to broker the Azimut for no additional commission. If the Azimut is sold in conjunction with a broker, other than Yachtcenter, then a 3% commission may be payable. Any proceeds will be for your benefit. If you prefer to take possession of the Azimut directly, please let us know and we will make alternate arrangements for transfer of title directly to you.

October 25, 2012 Letter (DE# 24-3 at 48-49, 9/26/14).

On March 19, 2013, Hatteras sent Alcaras a check for $72,724.22. This amount

consisted of the proceeds from the sale of the GT60 ($1,375,000) minus what Hatteras

believes Alcaras still owed to Hatteras for the GT60 and Hatteras's expenses in

securing the GT60's re-sale.[7] Hatteras again asked Alcaras to advise Hatteras if Alcaras preferred to take title to the Azimut personally, instead of allowing Hatteras (though Yachtcenter) to make efforts to sell the Azimut. To date, the plaintiffs have not cashed the $72,724.22 check and Alcaras has never taken title or otherwise exercised ownership over the Azimut.

Yachtcenter has made efforts to re-sell the Azimut on Alcaras's behalf. This endeavor has proved challenging due to the deteriorating political and business climate in Venezuela.[8]

On May 1, 2014, Yachtcenter sent a letter to Hatteras stating that it had received an offer from a third party to purchase the Azimut for $500,000. This was the first offer Yachtcenter had received for the Azimut. Since it was Hatteras's position that the Azimut belonged to Alcaras, Hatteras immediately notified Alcaras of the offer and sought his approval. Alcaras refused to approve Yachtcenter's sale of the Azimut, disputing that the Azimut belonged to him. Hatteras proposed that the parties stipulate to an escrow-like arrangement under which the Azimut could be sold and the proceeds held for the eventual benefit of either Alcaras or Hatteras, pending the outcome of this litigation. Alcaras refused to agree to the escrow-like arrangement.

The Azimut remains under Hatteras's control and continues to be listed for sale in Yachtcenter's inventory. No further offers to purchase the Azimut have been made

---

[7] The plaintiffs dispute that the $72,724.22 amount is an accurate reflection of the funds owed to Alcaras.

[8] The plaintiffs dispute that Hatteras undertook reasonable efforts to sell the Azimut.

15

since May 2014.

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, is guided by the standard set forth in Federal Rule of Civil Procedure 56(a), which states, in relevant part, as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). That is, "[t]he moving party bears the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Celotex, 477 U.S. at 323) (internal quotation marks omitted).

In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997). If the record presents factual issues, the Court must deny the motion and

proceed to trial. <u>Adickes</u>, 398 U.S. at 157; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial. <u>Celotex</u>, 477 U.S. at 322-323. Consequently, the non-moving party cannot merely rest upon his or her bare assertions, conclusory allegations, surmises or conjectures.  <u>Id.</u>  As the Supreme Court noted in <u>Celotex</u>:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

<u>Id.</u> at 322-323. Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could reasonably find for the non-movant. <u>Anderson</u>, 477 U.S. at 251; <u>Matsuchita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

## ANALYSIS

Hatteras seeks final summary judgment in its favor on all three counts of the complaint. The parties do not dispute that North Carolina law governs the plaintiffs' claims. <u>See</u> Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32, 10/15/14) (citing to North Carolina law with respect to all three claims); Hatteras's Motion for Summary Judgment (DE# 23, 9/26/14) (same). The undersigned will address the defendant's entitlement to summary judgment on each

17

count in turn.

## A.    Breach of Contract (Count I)

The elements of a breach of contract claim under North Carolina law are: "(1) [the] existence of a valid contract and (2) [a] breach of the terms of that contract." One Beacon Ins. Co. v. United Mech. Corp., 700 S.E.2d 121, 124 (N.C. Ct. App. 2010) (citation omitted). Although the parties do not dispute the existence of a valid contract,[9] they each claim that it was the opposing side who breached the Release Contract. For the reasons stated below, the undersigned concludes, as a matter of law, that Alcaras breached the Release Contract first when he failed to make final payment on the GT60 on the agreed upon date and failed to take delivery of that vessel.

### i.    Alcaras's Breach of Contract Theory

In the complaint, the plaintiffs alleged that the defendant breached the Release Contract by:

a. Failing to account for the proceeds of the sale of the [60C];

b. Failing to deliver the [GT60] on reasonable business terms based on exiting economic conditions which were not anticipated by the parties;

c. Failing to properly credit additional funds towards the installation on the [GT60] of the same custom features present on the [60C] as required under the [Release Contract];

d. Improperly assessing against the amount due from Hatteras to Beretta's in connection with the sale of the [GT60] further commission and/or dealer fees associated with the sale of the [60C] and Beretta's acquisition of the [GT60]; and

---

[9] See Complaint (DE# 1-2 at 8, 6/6/14) (alleging that "[p]laintiff Alcaras and Hatteras entered into the [Release Contract]"); Answer and Affirmative Defenses of Hatteras Yachts, Inc. (DE# 4 at 12, 6/13/14) (stating that "Hatteras admits that Alcaras and Hatteras entered into the Release [Contract].").

e. Improperly assessing against the amount due from Hatteras to Beretta's in connection with the sale of the [GT60] certain maintenance, storage, and interest fees through the sale date of the [GT60] to a third party.

Complaint (DE# 1-2 at 8-9, 6/6/14). In their response to the instant motion, the plaintiffs explained that their breach of contract claim falls into two categories:

> First, there is the claim resulting from Hatteras'[s] unilateral decision to change the contract by selling the [60C] before completing the [GT60]. In doing so, it eviscerated Alcaras'[s] ability to transfer the financing to the [GT60]. Alcaras testified directly that he would not have entered into the [Release Contract] if he could not finance the [GT60]. . . . The [Release Contract] was modified, in writing at the time of closing, to incorporate this essential term. The [Release Contract] specifically provides that the [60C] was being returned to Hatteras, *subject to the existing financing on the [60C]*.
>
> . . . Alcaras separately claims that Hatteras damaged him by failing to take reasonable good faith efforts to "cover" when it resold the [GT60].

Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 3-4, 10/15/14) (emphasis in original; record citations omitted).

### a.   Hatteras Did Not Breach the Release Contract as a Matter of Law

Hatteras does not dispute that when the parties initially began their negotiations, the intent was for Alcaras to transfer the existing loan on the 60C to the yet-to-be built GT60. See Transcript November 4, 2014 Hearing (DE# 52 at 7, 11/14/14). However in an email dated January 26, 2010, Hatteras told Alcaras that the transfer of the loan would at the very least be a "large hurdle." See January 26, 2010 Email (DE# 44-3 at 14, 10/30/14). Nonetheless, the parties continued with their negotiations and on February 12, 2010 executed the Release Contract (DE# 24-2 at 8-9, 9/26/14).

The plaintiffs argue that Hatteras breached the Release Contract first when Hatteras paid off the existing loan on the 60C. <u>See</u> Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 4, 10/15/14). The plaintiffs argue that Hatteras was required to keep the original loan in place until the GT60 was built so that Alcaras could transfer the loan from the 60C to the GT60.[10] <u>See</u> Transcript November 4, 2014 Hearing (DE# 52 at 29, 11/14/24).

"When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court . . . and the court cannot look beyond the terms of the contract to determine the intentions of the parties . . . . However, when there is ambiguity in the language used, the intent of the parties is a question for the jury and parol evidence is admissible to ascertain that intent." <u>Piedmont Bank and Trust Co. v. Stevenson</u>, 339 S.E.2d 49, 52 (N.C. Ct. App. 1985) (citations omitted). The undersigned has already determined that the Release Contract (DE# 24-2 at 8-9, 9/26/14) is unambiguous. <u>See</u> Order (DE# 53, 11/25/14). Therefore, the intent of the parties must be determined from the text of the Release Contract.

The Release Contract states in pertinent part:

> WHEREAS, [Alcaras] has agreed to deliver the [60C], with all features originally purchased, and **transfer title free and clear of** ~~any~~ ***all* liens and encumbrances, *except for [Alcaras's] primary bank loan*,** to [Yachtcenter] within 10 days of the effective date of this agreement.

---

[10] Of note, Mercantil Commercebank was not a party to the Release Contract and there is no record evidence that it would have allowed the transfer of the loan even after the GT60 was built. <u>See</u> Transcript November 4, 2014 Hearing (DE# 52 at 24, 26, 11/14/24); <u>see also</u> Deposition of Jessika Jaar-Arango (DE# 29-5 at 17, 10/14/14) (employee of Mercantil Commercebank testifying that she did not know if bank would have allowed the transfer of a loan from one collateral to another collateral).

***

[Alcaras] further agrees to indemnify [Hatteras and Yachtcenter] for any unknown liens or encumbrances that are later claimed against [Hatteras] as a result of [Alcaras's] use of the [60C]. [Alcaras] further agrees to **indemnify** [Hatteras and Yachtcenter] for any losses incurred from the failure of [Alcaras] to **promptly and correctly provide and sign off on the [60C's] title**, bill of sale, and any other instruments reasonably requested by [Hatteras and Yachtcenter], as well as any and all costs, including attorney fees, **in obtaining these instruments promptly executed, free and clear of all liens**.

***

. . . [Alcaras] will provide specifications for the [GT60] no later than May 31, 2010, and Hatteras will have the [GT60] ready for delivery by May 15, 2011 or as soon thereafter as possible. [Alcaras] . . .  further agrees that he will be responsible for the costs of any additions or modifications to the [GT60] that are not currently on the [60C] at a 15% discount from retail prices. [Hatteras] also **agrees to pay any additional taxes or costs associated with financing** and titles of the [GT60] and will take delivery of the [GT60] in New Bern, North Carolina, USA, upon its completion. Hatteras will cooperate with [Alcaras's] bank, as requested by [Alcaras], to provide information concerning this transaction. If requested by [Alcaras], Hatteras is willing to provide [Alcaras's] bank with a written guarantee to provide the GT60 in the said timeframe . . . .

Any costs payable by [Alcaras] to Hatteras for additions and modifications will be paid to Hatteras prior to completion and delivery.

***

[Yachtcenter] agrees to transport the [60C] to a designated location in Florida, USA, and any expenses incurred will be reimbursed by Hatteras. [Yachtcenter] agrees to take no mark up on the [GT60] or any of its options and/or components and take no sales commission. **[Yachtcenter] will also assist Hatteras in the sale of the [60C] at no cost or commission to [Alcaras] or Hatteras,** other than actual costs, including 3rd party broker fees, associated with the sale of the [60C] which will be reimbursed by Hatteras.

Release Contract (DE# 24-2 at 8-9, 9/26/14) (handwritten alterations represented by italicized and stricken text; bold emphasis added).

Under the Release Contract, Alcaras was to return the 60C to Hatteras with the original loan. The Release Contract did not require that Hatteras keep that loan in place until the construction of the GT60 was completed. There is simply no provision in the Release Contract requiring Hatteras to maintain the loan for any period of time or for the purpose of allowing Alcaras to obtain financing through a loan transfer. In fact, the Release Contract does not address how Alcaras would pay for the GT60 after it was built. There are no provisions placing limits on financing terms or making Alcaras's contractual obligations contingent on his ability to transfer the original loan to the GT60 or otherwise obtain financing under the same terms as that loan.

There is also nothing in the text of the Release Contract that precluded Hatteras from reselling the 60C once Alcaras returned it. To the contrary, the Release Contract makes clear that the sale of the 60C was contemplated by the parties as evidenced by the following provision: " [Yachtcenter] will also assist Hatteras in the sale of the [60C] at no cost or commission to [Alcaras] or Hatteras . . . ." Release Contract (DE# 24-2 at 8-9, 9/26/14). In order to effectuate the sale to a new buyer, Hatteras would have necessarily had to satisfy the original loan on the 60C. As the defendant points out, "Alcaras [even] *helped* Hatteras accomplish the 60C's re-sale to a third party in October 2010." Reply Brief in Support of Hatteras's Motion for Summary Judgment (DE# 40 at 6, 10/24/14) (emphasis in original). Thus, Hatteras did not breach the Release Contract when it sold the 60C and satisfied the existing loan with the sales proceeds.

As the Supreme Court of North Carolina has noted, contracting parties "are generally bound only by the terms of their contract and the Uniform Commercial Code."

Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 267 (N.C. 2014). Hatteras did not breach the Release Contract as a matter of law because it was under no contractual obligation to keep the loan on the 60C in place or to refrain from selling the 60C until the GT60 was completed.

### b.    Alcaras Breached the Release Contract as a Matter of Law

Hatteras argues that Alcaras breached the Release Contract thrice by: "failing to meet his deadlines to furnish specifications for, to submit payment for, and to take delivery of the GT60 – even after Hatteras's repeated extensions of those deadlines as an accommodation to Alcaras." Hatteras's Motion for Summary Judgment (DE# 23 at 12-13, 9/26/14).

The plaintiffs argue that "whether Alcaras submitted his final specifications to Hatteras (or to Hatteras'[s] broker as instructed by [Meyer]) is an issue of fact for which a jury must accord the appropriate weight." Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 6, 10/15/14). As evidence of this factual dispute, the plaintiffs cite to Alcaras's deposition wherein he testified that he provided the specifications to a Yachtcenter representative (Carlos Vera) upon the advice of Meyer. Id. The plaintiffs also cite to Meyer's April 27, 2011 letter wherein Meyer purportedly "acknowledges that Alcaras followed the agreed upon procedure for providing specifications through Carlos Vera . . . ." Id.

Regardless of whether Alcaras submitted the final specifications for the GT60, the undisputed record evidence is that Alcaras failed to make final payment for the GT60 on the agreed upon date and that he failed to take delivery of that vessel. The Release Contract expressly required Alcaras to make final payment for the GT60 and to

take delivery of that vessel. Therefore, the undersigned concludes as a matter of law that Alcaras breached the Release Contract.[11]

### c.   The Doctrine of Frustration of Purpose Does Not Excuse Alcaras's Breach

The plaintiffs argue that the doctrine of frustration of purpose excused Alcaras's performance under the Release Contract. See Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 11, 10/15/14). In other words, Alcaras was not required to make final payment on the GT60 or take delivery of that vessel because he was unable to transfer the original loan from the 60C to the GT60 or otherwise obtain financing under the same terms.

In discussing the doctrine of frustration of purpose, the Supreme Court of North Carolina has stated:

> **Changed conditions supervening during the term of a contract sometimes operate as a defense excusing further performance on the ground that there was an implied condition in the contract that such a subsequent development should excuse performance or be a defense**, and this kind of defense has prevailed in some instances even though the subsequent condition that developed was not one rendering performance impossible . . . . In such instances, . . . the defense doctrine applied has been variously designated as that of frustration of the purpose

_____

[11] The defendant raises two additional arguments in support of summary judgment on the plaintiffs' breach of contract claim. It argues that the damages sought by the plaintiffs are not recoverable under contract law. See Hatteras's Motion for Summary Judgment (DE# 23 at 12, 9/26/14). It also argues that the plaintiffs' statement regarding their unjust enrichment claim that Hatteras's actions concerning the sale of the GT60 fall outside the scope of the Release Contract entitle the defendant to summary judgment on the plaintiffs' breach of contract claim. See Reply Brief in Support of Hatteras's Motion for Summary Judgment (DE# 40 at 10-11, 10/24/14). The Court does not need to address these additional arguments because Alcaras breached the Release Contract first and therefore, the plaintiffs cannot prevail on their breach of contract claim.

or object of the contract or commercial frustration.

Although the doctrines of frustration and impossibility are akin, frustration is not a form of impossibility of performance. It more properly relates to the consideration for performance. Under it **performance remains possible, but is excused whenever a fortuitous event supervenes to cause a failure of the consideration or a practically total destruction of the expected value of the performance**. The doctrine of commercial frustration is **based upon the fundamental premise of giving relief in a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose**.

Brenner v. Little Red Sch. House, Ltd., 274 S.E.2d 206, 209 (N.C. 1981) (quoting 17

Am.Jur.2d Contracts § 401 (1964) (internal quotation marks omitted; emphasis added).

The state supreme court further noted that, "[i]f the frustrating event was reasonably

foreseeable, the doctrine of frustration is not a defense." Id.

The plaintiffs argue that:

the availability of the existing loan obligation through the period of construction of the [GT60] was an implied condition in the [Release Contract]. The [Release Contract] indicate[d] that maintaining the existing financing was an essential condition, and naturally, a necessary condition precedent to Alcaras'[s] obligation to take delivery of the [GT60]. Hatteras was made aware that Alcaras would not enter into the [Release Contract] unless the [60C] could be returned subject to the existing loan obligation and the [GT60] financed with the same loan. Bob Nenni [Hatteras's CFO] testified that Hatteras knew Alcaras did not want to incur additional closing costs, forfeit his favorable interest rate and financing terms due to Hatteras'[s] failure provide him with a defective-free [60C] . . . . Just days before the [Release Contract] was signed, Jim Meyer [Hatteras's then CEO] confirmed "as you know, our plan assumed that your bank loan would remain in place effectively transferring from . . . [the 60C] to a factory commitment for a new boat and finally to the new boat itself." . . . . At signing, Jim Meyer specifically included a provision in the [Release Contract] that clarifies [the 60C] was being delivered subject to the existing primary bank loan. . . . As a result, the [Release Contract] provided that the [GT60] would be financed with the same loan that was in place for the [60C] . . . and Hatteras took possession of the [60C] subject to the existing loan obligation. . . .

25

> Moreover, when Hatteras decided to sell the [60C] before the time contemplated by the parties (i.e., before construction on the [GT60] was complete) and economic conditions eliminated all previously available financing opportunities, "a failure of consideration or the expected value of performance" occurred . . . . **Neither Alcaras, nor Hatteras could foresee that Mercantil Commercebank would eliminate the loan program under which the original financing was issued. Nor did Hatter[a]s foresee that the market conditions would deteriorate substantially.** Karl Kemppainen, [Hatteras's] Vice President of Sales and Marketing, testified "in no way, could anybody have ever planned for what's going on in the Venezuelan market right now." . . . As a point of fact, Alcaras was not denied a loan by Mercantil Commercebank for any reason related to his credit. He was denied the loan because the program under which the loan could have been issued had been canceled.

Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 12-13, 10/15/14) (emphasis added; record citations omitted). The plaintiffs further claim that there are genuine issues of material fact:

> regarding whether or not the changed economic conditions which prevented Alcaras from obtaining replacement financing was reasonably foreseeable, whether Hatter[a]s'[s] prepayment of the loan obligation exacerbated Alcaras'[s] problems, whether . . . Hatteras or Alcaras assumed the risk of the unavailability of continued financing, whether Hatteras'[s] prepayment of the existing loan obligation shifted any assumed risk from Alcaras to Hatteras (or vice versa), and whether Alcaras'[s] nonperformance should be excused.

Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 13, 10/15/14).

As previously noted, there is nothing in the text of the Release Contract which discusses the terms under which Alcaras would obtain financing for the GT60 and the Release Contract does not state that Hatteras was required to maintain the original loan on the 60C in place for the benefit of Alcaras. Regardless of whether the economic downturn in Venezuela was foreseeable, the parties knew prior to entering into the Release Contract that the feasibility of transferring the existing loan on the 60C to an

26

as-yet-to-be-built vessel "ha[d] turned out to be a large hurdle. . . ." January 26, 2010 Email (DE# 44-3 at 14, 10/30/14). The instant case is different from "a situation where the parties could not reasonably have protected themselves by the terms of the contract against contingencies which later arose." Brenner 274 S.E.2d at 209. Having identified a "large hurdle," the parties proceeded to enter into the Release Contract without making Alcaras's contractual obligations expressly contingent upon obtaining acceptable financing.

Based on this record, Alcaras's inability to secure a loan for the GT60 under the same terms as the 60C was hardly unforeseeable. For this reason, the undersigned finds as a matter of law, that the doctrine of frustration of purpose is inapplicable to the instant case and does not excuse Alcaras from his obligations under the Release Contract.

### ii.    Hatteras's Mitigation of Damages

Having decided that Alcaras, not Hatteras, breached the Release Contract, the undersigned must next address the defendant's mitigation of damages. In North Carolina, "the non-breaching party has a duty to mitigate its damages by 'exercis[ing] reasonable care and diligence to avoid or lessen the consequences of [the] wrong.'" Meineke Car Care Ctrs., Inc. v. RLB Holdings, LLC, 423 F. App'x 274, 281 (4th Cir. 2011) (quoting Miller v. Miller, 160 S.E.2d 65, 74 (N.C. 1968) (alterations in original)).

The plaintiffs do not dispute that under North Carolina law, they have the burden of proving by a preponderance of the evidence that the defendant's mitigation costs were not calculated correctly. See Transcript November 4, 2014 Hearing (DE# 52 at 33, 11/14/14). They argue that summary judgment is improper in the instant case because

"genuine issues of fact remain concerning whether Hatteras properly accounted for and credited [certain items] when preparing its calculation of the amounts it owed to Alcaras." Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 7, 10/15/14). The defendant responds that "where a party offers only unsupported speculation that the other party's conduct was unreasonable, as the [p]laintiffs do here, that speculation is not enough to defeat summary judgment." Reply Brief in Support of Hatteras's Motion for Summary Judgment (DE# 40 at 4, 10/24/14).

The plaintiffs have identified thirteen items which they claim were improperly deducted by Hatteras and should have been paid to Alcaras. See Plaintiffs' Response to Defendant's Statement of Undisputed Facts (DE# 29 at 13-15, 10/14/14). These items are the following:

a.      A broker fee of $100,000 paid in connection with the sale of the 60C;

b.      Imposition of "interest" by Hatteras in the amount of $51,799.49;

c.      A broker fee of $225,000 in connection with the sale of the GT60;

d.      A failure to credit approximately $118,157.73 of items existing  on the 60C but removed from the GT60;

e.      $70,000 in uncredited transportation costs owed to Alcaras under the Release Contract;

f.      $92,000[12] for an engine upgrade existing on the 60C, which was to be provided at no charge;

g.      Additional items (i.e., anchor chute with windlass and speakers) existing on the 60C for which Hatteras improperly charged in the GT60 in the amount of $21,158.10;

h.      The improper assessment against Alcaras of miscellaneous maintenance expenses in the amount of $19,712.64;

i.      Fuel provided to the new owner of the GT60 in the amount of $5,967;

j.      Additional proceeds from the sale of the 60C in the amount of $72,724.22;

k.      Hatteras's failure to sell the Azimut for at least the value stated in Hatteras's written representation to Alcaras in the amount of $700,000 - $900,000;

l.      Additional discounts provided to the purchasers of the 60C, which Kemppainen testified totaled upwards of $137,000; and

m.      Additional damages from the lost opportunity and value of the GT60, which was sold below market value.

Id.

At the hearing on the instant motion, the defendant argued, generally, that the 13 items listed above could be grouped into two categories: (1) "credits or charges that [the] plaintiffs claim they are due under the [Release C]ontract" and (2) mitigation costs. See Transcript November 4, 2014 Hearing (DE# 52 at 54, 57, 11/14/14).  With respect to the credits or charges, the defendant argued that the plaintiffs were no longer entitled

---

[12] Initially, the amount listed by the plaintiffs for this engine upgrade was $72,000. See Plaintiffs' Response to Defendant's Statement of Undisputed Facts (DE# 29 at 14, 10/14/14).  At the hearing on the instant motion the plaintiffs stated that the correct amount was $92,000. See Transcript November 4, 2014 Hearing (DE# 52 at 50, 11/14/14).

to those credits/charges when Alcaras breached the Release Contract. Id. 54-55 (arguing that "[u]nder North Carolina law, [the] plaintiffs breach[ed] . . . . They don't get to enforce the contract anymore."). With respect to the second category – mitigation costs – the defendant maintains that the plaintiffs failed to meet their burden of showing that Hatteras did not mitigate properly and Hatteras is therefore entitled to summary judgment on those items which constitute mitigation costs. Id. at 57. The undersigned will address the aforementioned items in turn.

### a.   Broker Fee ($100,000)

The plaintiffs argue that they should not be responsible for the $100,000 broker's fee paid in connection with the sale of the 60C because the Release Contract provided that Alcaras would not be assessed such a fee. See Transcript November 4, 2014 Hearing (DE# 52 at 45-46, 11/14/14). The Release Contract states in pertinent part:

> [Yachtcenter] agrees to transport the [60C] to a designated location in Florida, USA, and any expenses incurred will be reimbursed by Hatteras. [Yachtcenter] agrees to take no mark up on the [GT60] or any of its options and/or components and take no sales commission. **[Yachtcenter] will also assist Hatteras in the sale of the [60C] at no cost or commission to [Alcaras] or Hatteras**, other than actual costs, including 3rd party broker fees, associated with the sale of the [60C] which will be reimbursed by Hatteras.

Release Contract (DE# 24-2 at 8-9, 9/26/14) (emphasis added).

In its motion, Hatteras states the following:

> under North Carolina law, failure to make contractually required payments constitutes a breach sufficient to release the other party from any duty to perform. See In Re Foreclosure of C&M Investments, 484 S.E.2d 546, 549 (N.C. 1997). In C&M Investments, for instance, the parties had entered into an agreement whereby parcels of land were to be "released" incrementally to the plaintiff, contingent upon plaintiff's semiannual payments and compliance with conditions set forth in the agreement. Id. When the plaintiff failed to make timely payments, the court ruled that the

plaintiff's failure discharged the defendant of any duty to perform. Id. Just so here. By failing to meet his deadlines to Hatteras under the Release Contract, Alcaras forfeited his rights to demand Hatteras's performance of that contract.

Hatteras's Motion for Summary Judgment (DE# 23 at 13, 9/26/14).

"[W]hen the first breaching party commits a material breach, that party cannot enforce the contract." Roanoke Props. Ltd. P'ship v. Dewberry & Davis, 30 F. App'x 121, 124 (4th Cir. 2002).[13] Under the Release Contract, the parties agreed that Yachtcenter would sell the 60C without assessing a broker's fee to Alcaras. At the time Alcaras breached the Release Contract, the 60C had already been sold. Therefore, in this instance, Alcaras is not seeking to enforce a contractual term which has not yet occurred. Moreover, the $100,000 broker's fee is not a mitigation cost. At the time Alcaras breached the contract, the 60C had already been sold. Therefore, Hatteras did not incur the $100,000 broker's fee in an effort to mitigate its damages following a breach of the Release Contract. For these reasons, the $100,000 broker's fee is different from the other costs/charges that the plaintiffs are seeking to recover under the Release Contract and the undersigned concludes that Hatteras has not shown that it properly charged Alcaras for this amount. Hatteras's entitlement to the $100,000 broker's fee should be submitted to the trier of fact.

---

[13] Roanoke was decided under Virginia law. However there was a dispute between the parties concerning whether Virginia law or North Carolina law governed. Roanoke, 30 F. App'x at 124 n.3. The Fourth Circuit stated that "[b]ecause [it could not] discern any difference between the two states' laws that would affect [its] resolution of th[e] claim, [it] assume[d], without deciding, that Virginia law [wa]s applicable." Id.

### b.    Interest ($51,799.49)

Next, the plaintiffs argue that "Hatteras also [improperly] assessed Alcaras interest in the amount of $51,799.49 at a rate of 8%." Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 9, 10/15/14). According to the plaintiffs, Hatteras did not provide the funds to payoff the loan on the 60C because that loan was paid off from the sale of the 60C. Id. The plaintiffs further argue that Hatteras did not step into the shoes of Mercantil Commercebank (Alcaras's lender) because any loan to Alcaras in excess of $1.3 million would have violated the statute of frauds since it was not reduced to writing. Id. at 9-10. The plaintiffs further maintain that "[i]t is of no import that Alcaras 'benefit[t]ed from not having to pay 8% interest on [his] loan anymore'" because "Alcaras made clear from the outset that he did not wish to stop paying interest on his loan and intended to continue to pay during the construction of the [GT60]." Id. at 10. Finally, the plaintiffs note that the Release Contract does not contain any provision requiring the plaintiffs to pay interest to Hatteras in the event Alcaras could not take delivery of the GT60.

The defendant maintains that it is entitled to recover the $51,799.49 in interest because:

> Alcaras thus benefitted from not having to pay 8% interest on that loan anymore. Moreover, since Hatteras credited Alcaras's account on the GT60 with the amount of its loan repayment without requiring Alcaras to make a new downpayment, Hatteras effectively lost the present value of that cash (which used to be Hatteras's own money) and thus also the ability to earn interest on that money in its own accounts until the GT60 was resold. In short, this interest figure represents an expense incurred by Hatteras solely by virtue of Alcaras's failure to pay for the GT60. Upon Alcaras's default, that money became recoverable to Hatteras and chargeable to Alcaras.

Hatteras's Motion for Summary Judgment (DE# 23 at 11, 9/26/14) (footnote omitted). Alternatively, the defendant argues that it is entitled to this amount because: "In the Release Contract, Alcaras agreed to indemnify Hatteras for all costs associated with conveying title in the 60C to Hatteras 'free and clear of all liens' . . . . In order to obtain free and clear title, Hatteras was required to pay off Alcaras's bank loan." Id. at 11 n.5.

Because the defendant has not shown that the $51,799.49 in interest were incurred as part of its mitigation of damages (at the time Hatteras paid off the original loan, Alcaras had not yet breached the contract), the undersigned cannot conclude as a matter of law that the defendant was entitled to charge Alcaras for $51,799.49 in interest.

### c.    Broker Fee ($225,000)

The plaintiffs initially argued that Hatteras breached the Release Contract when it allowed Yachtcenter to take a commission of $225,000 on the sale of the GT60 because the Release Contract "specifically prohibits Yachtcenter from receiving such a fee, and provides '[Yachtcenter] agrees to take no mark up on the [GT60] or any of its options and/or components and take no sales commission.'" Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 9, 10/15/14) (quoting Release Contract) (alteration in response). At the hearing on the instant motion, the plaintiffs stated that they were no longer disputing this amount.[14]

---

[14] At the hearing on the instant motion, the following colloquy took place:

THE COURT: Okay. All right. A broker fee of 225 in connection with the sale of the [GT60].

[Counsel for Plaintiffs]: Right. That one, Your Honor, the [GT60], the

Therefore, the reasonableness of the $225,000 broker's fee is no longer at issue and summary judgment should be entered in favor of the defendant as to this specific mitigation claim.

### d.   Uncredited Existing Items ($118,157.73)

The plaintiffs note that the 60C and the GT60 "were going to be equally outfitted" and that under the Release Contract, "if Mr. Alcaras remove[d] items from the [60C] and d[id] not put them on the [GT60], he [would] get[ ] a credit for that." Transcript November 4, 2014 Hearing (DE# 52 at 48-49, 11/14/14). The Release Contract stated as follows: "[the GT60] will have the same options and components as the [60C]." Release Contract (DE# 24-2 at 8, 9/26/14). Because Alcaras breached the Release Contract he is not entitled to enforce this provision of the contract. See Roanoke, 30 F.

---

agreement was that Miguel Alcaras, there would no be no brokerage fee for him taking delivery of the boat.

He was taking delivery of the boat to the Yacht[c]enter in Venezuela. When they sold the boat to somebody else, they took a brokerage fee.

THE COURT: Okay. But don't they have to, I mean the boat is no longer going to Alcaras. It is now going to some third-party.

**They have got to get rid of it to mitigate their damages, and the only way to get rid of it is to pay somebody a brokerage fee, isn't it?**

**[Counsel for Plaintiffs]: Your Honor, I have to agree with that.**

**THE COURT: All right. I mean, do you think that there is a disputed fact of whether or not that fee is reasonable or not?**

**[Counsel for Plaintiffs]: We haven't presented any evidence to that, Your Honor.**

Transcript November 4, 2014 Hearing (DE# 52 at 47-48, 11/14/14) (emphasis added).

App'x at 124, <u>supra</u>. Accordingly, the plaintiffs are not entitled to a $118,157.73 credit for items that were not included in the GT60.

### e.    Uncredited Transportation Costs ($70,000)

The plaintiffs further argue that Hatteras saved $70,000 in transportation costs associated with moving the GT60 to Venezuela. <u>See</u> Transcript November 4, 2014 Hearing (DE# 52 at 49, 11/14/14). The plaintiffs maintain that Alcaras should have been credited for this amount. The plaintiffs calculate that the transportation costs of moving the GT60 from North Carolina to Venezuela would be approximately $70,000 because that is what Alcaras paid to move the 60C (the original yacht) to Venezuela. The Release Contract (DE# 24-2 at 8, 9/26/14) stated as follows: "Hatteras will reimburse [Alcaras] for reasonable costs . . . to transport the [GT60] to Venezuela." Because Alcaras breached the Release Contract he is not entitled to enforce this provision of the contract. <u>See Roanoke</u>, 30 F. App'x at 124, <u>supra</u>. Moreover, the Release Contract uses the word "reimburse" and Alcaras never expended the money to transport the GT60 to Venezuela. Accordingly, the plaintiffs are not entitled to a $70,000 credit for transportation costs.

### f.    Charge for Engine Upgrade ($92,000)

At the hearing on the instant motion, the plaintiffs explained why Alcaras should not have been charged for an engine upgrade on the GT60:

> Mr. Alcaras outfitted the original boat with 1650 horse power engines. The new boat was going to [have] 1700 horse power engines. Hatteras agreed to give him those new 1700 horse powered engines for no up charge, but when they sent him the accounting, they charged him $92,000 for it, and I think that's an exhibit, the accounting part.

***

> Mr. Kemp[painen] who was deposed, who is the sales manager for Hatteras, testified that the upgrade was not supposed to have been charged because they agreed that they would give him the upgraded engines at no charge.

See Transcript November 4, 2014 Hearing (DE# 52 at 50, 11/14/14).

> During his deposition, Kemppainen testified as follows:

> A.      But I'm right at a 100 percent sure that they're 1650s. Because he came in during the build, and we -- the standard engine in the GT60 was 1600, and he made a claim that he wanted the 1700s and we did agree to give him that up-charge at no charge.

> Q.      Okay.

> A.      And that was one of the special considerations.

> Q.      So you agreed to provide the 1700s in the GT60 at no up-charge?

> A.      Yes, at no charge.

> Q.      But now, you're charging him for it?

> A.      I'd have to go back and look at how this all came together.

> **Q.      Okay. But, if you agreed to outfit the new boat with no markup for the GT -- 1700s, it should not have been charged to him?**

> **A.      That's absolutely true.**

Deposition of Karl Kemppainen (DE# 29-2 at 96, 10/14/14) (emphasis added). In its reply, the defendant responds that Alcaras might have been entitled to certain credits "if he had not defaulted – i.e., if Alcaras had taken delivery of the GT60. Once Alcaras defaulted, however, he forfeited all interest in the GT60 – a forfeiture Alcaras acknowledged." Reply Brief in Support of Hatteras's Motion for Summary Judgment (DE# 40 at 8, 10/24/14).

Although Alcaras is not entitled to enforce the terms of the Release Contract, Kemppainen's above quoted deposition testimony, creates an issue of fact as to whether Hatteras has waived its claim of charging Alcaras for the $92,000 engine upgrade.

### g.      Additional Items ($21,158.10)

The plaintiffs claim that Alcaras should have been credited $21,158.10 for items that were on the 60C, but were not the GT60. See Transcript November 4, 2014 Hearing (DE# 52 at 51, 11/14/14). For the same reasons as discussed above, the undersigned concludes that Alcaras, as the breaching party, cannot enforce the terms of the Release Contract and is therefore not entitled to a $21,158.10 credit for items that were not on the GT60.

### h.      Miscellaneous Maintenance Expenses ($19,712.64)

The plaintiffs also argue that they should not be responsible for the maintenance charges incurred by the GT60 because Alcaras did not agree to pay for such an expenditure. See Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 8, 10/15/14). Alternatively, the plaintiffs argue that "Hatteras [cannot] reasonably assess [Alcaras] maintenance cost for something he did not own." Id. at 8.

The plaintiffs further note that "Hatteras did not bring a counterclaim for breach of contract, nor has Hatteras asserted the affirmative defense of set-off." Id. As such, the plaintiffs argue that "Hatteras has offered no basis in law or the record to justify its unilateral imposition of . . . maintenance charges" and the reasonableness of such fees is a jury question. Id. In its reply, the defendant "maintains that its pleadings are

appropriate and sufficient under Rule 8(c)(2), but should the Court agree that Hatteras's

inclusion of Alcaras's breach as an affirmative defense is insufficient, then Hatteras

respectfully requests leave to amend its Answer to label Alcaras's breach a

counterclaim, too (and assert setoff as a defense)." Reply Brief in Support of Hatteras's

Motion for Summary Judgment (DE# 40 at 4, 10/24/14).

> In its affirmative defenses, Hatteras asserted the following:

> 11. Alcaras materially breached the terms of the Release [Contract] and
> the parties' agreement by, among other things, failing to provide
> specifications for the GT60, failing to pay for the GT60, and failing to take
> delivery of the GT60.

***

> 18. Upon Alcaras's breaches of the Release [Contract] and of the parties'
> agreement as described above, Hatteras became entitled to cover in
> order to limit or reduce Hatteras's own losses caused by Alcaras's actions
> and inactions.

Answer and Affirmative Defenses of Hatteras Yachts, Inc. (DE# 4 at 18-19, 6/13/14).

Thus, the plaintiffs are well aware of Hatteras's claim that Alcaras breached the

Release Contract. Nonetheless, to the extent there is a deficiency in Hatteras's

pleadings, the Court should allow Hatteras to amend its answer as there is no surprise

or prejudice to the plaintiffs. See In re Engle Cases, 767 F.3d 1082, 1108 (11th Cir.

2014) (recognizing that leave to amend should be liberally granted unless there is

undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies, undue

prejudice to the opposing side or futility in the amendment). Here, the record shows that

at all times, Hatteras has claimed that Alcaras breached the Release Contract and that

it was entitled to recover the costs it incurred in mitigating its damages as a result of

that breach.

Once Alcaras breached the Release Contract, he was no longer entitled to enforce its terms. Roanoke, 30 F. App'x at 124. Therefore, it is immaterial that Alcaras did not agree under the Release Contract to pay for the maintenance of the GT60. Under North Carolina law, "the nonbreaching party is under duty to use reasonable diligence to minimize the loss occasioned by the injuring party's breach of contract." Isbey v. Crews, 284 S.E.2d 534, 538 (N.C. Ct. App. 1981). Hatteras represents that it incurred $19,712.64 in the maintenance of the GT60 from the date Alcaras failed to take delivery on August 15, 2011 until it was sold to a new buyer as part of its mitigation of damages. The plaintiffs have presented no evidence that the maintenance of the GT60 was unnecessary or that $19,712.64 for the maintenance of a vessel like the GT60 is excessive. Therefore, the defendant is entitled to summary judgment on this amount.

### i.     Fuel for New Owner of GT60 ($5,967)

Hatteras paid $5,967 in fuel to the new buyer of the GT60. The plaintiffs state that they should not be responsible for this amount because it was "neither included on the [60C], nor authorized by [Alcaras's] final specifications." Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 7, 10/15/14). The plaintiffs acknowledge that they have the burden of proof on the reasonableness of the defendant's mitigation costs. See Transcript November 4, 2014 Hearing (DE# 52 at 33, 11/14/14); see also Isbey, 284 S.E.2d at 538 (stating that "the burden is on the breaching party to prove that the nonbreaching party failed to exercise reasonable diligence to minimize the loss."). The plaintiffs have presented no record evidence that the $5,967 in fuel to the new buyer was an unreasonable amount or that

it was unnecessary in order to effectuate the sale of the GT60. Accordingly, the defendant is entitled as a matter of law to recover $5,967 in fuel costs.

### j.      Proceeds from the Sale of the GT60 ($72,724.22)

The plaintiffs also argue that they are entitled to $72,724.22. This amount represented the excess proceeds from the sale of the GT60. Of note, the parties do not dispute that Hatteras sent a check to Alcaras for this amount. See Hatteras's Statement of Undisputed Material Facts (DE# 24 at 9, 9/26/14); Plaintiffs' Response to Defendant's Statement of Undisputed Facts (DE# 29 at 6, 10/14/14). The plaintiffs state that they did not cash this check because it was offered by Hatteras as a full settlement. See Transcript November 4, 2014 Hearing (DE# 52 at 51, 11/14/14). Thus, there is no dispute between the parties that the plaintiffs are entitled to this amount.

### k.      Failure to Sell the Azimut ($700,000 - $900,000)

The plaintiffs argue that Hatteras did not act in good faith when it sold the GT60. Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 15, 10/15/14). The plaintiffs note that in March 2012, Hatteras notified Alcaras by email of a potential buyer for the GT60. Id.; see also March 5, 2012 Email (DE# 29-2 at 35, 10/14/14). The email explained that:

> The deal would be structured so that [Hatteras] would receive a cash portion that would cover the funds [Hatteras is] entitled to and you would receive . . . [the] Azimut that you would own free and clear to either keep or sell at your convenience to recapture your remaining equity. **The retail value of this boat could be in the range of $700,000 to $900,000 depending on the situation**.

March 5, 2012 Email (DE# 29-2 at 35, 10/14/14) (emphasis added). In an email dated March 6, 2012, Hatteras told Alcaras that the owner of the Azimut believed the boat

was worth $1,000,000 and concluded the email with the following statement: "If you are not interested in considering this arrangement, we will continue to look for other opportunities." March 6, 2012 Email (DE# 29-2 at 33, 10/14/14). The plaintiffs note that Hatteras sold the GT60 in August 2012, but did not tell Alcaras about the sale until October 25, 2012. See Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 16, 10/15/14). The plaintiffs argue that Hatteras also acted unreasonable in failing to sell the GT60 at the highest and best price. Id.

The defendant responds that its delay in notifying Alcaras of the sale of the GT60 is immaterial because "[b]y the time of the resale, Alcaras had already acknowledged that he lost all interest in the GT60" and there was no damage to the plaintiffs. See Reply Brief in Support of Hatteras's Motion for Summary Judgment (DE# 40 at 4, 10/24/14). Moreover, the defendant maintains that:

> It does not matter if Hatteras "concealed" the GT60's resale for two months . . . since it no longer bore on Alcaras's rights (or lack thereof). Nor does it matter that Hatteras suggested after Alcaras's default that Alcaras's approval of any resale might still be necessary . . . since [the p]laintiffs fail to argue that they detrimentally relied on Hatteras's suggestion.

Id. at 7 (citations omitted). At the hearing on the instant motion, the plaintiffs acknowledged that Hatteras did not need to obtain Alcaras's approval to sell the GT60. See Transcript November 4, 2014 Hearing (DE# 52 at 35, 11/14/14).

As further evidence of Hatteras's lack of good faith with respect to the sale of the GT60, the plaintiffs state that Hatteras acted unreasonable when it failed to investigate the value of the Azimut "or perform any due diligence at trade." Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 16,

10/15/14). The plaintiffs also fault Hatteras for delaying its liquidation of the Azimut thereby causing the Azimut to dissipate in value and in "authoriz[ing] its broker to deduct unknown amounts of maintenance fees from the ultimate sale price of the [Azimut] . . . as well as insurance premiums. . . ." Id. In any event, the plaintiffs maintain that whether Hatteras acted in bad faith in failing to maximize the value of the GT60 and in delaying the liquidation of the Azimut is a jury question. Id. at 17.

The defendant maintains that the reasonableness of its mitigation of damages should be decided by the Court as a matter of law because the plaintiffs failed to retain an expert to show that the sale of the GT60 was not a good value and that there is no record evidence that Hatteras tried to increase Alcaras's exposure as a result of this sale. See Transcript November 4, 2014 Hearing (DE# 52 at 20, 11/14/14). At the hearing on the instant motion, the defendant argued that the decline in value of the Azimut is "just a simple fact of deprecation." See Transcript November 4, 2014 Hearing (DE# 52 at 15, 11/14/14).

In North Carolina, "[t]he duty to mitigate requires that an injured [party], whether his case be tort or contract, must exercise reasonable care and diligence to avoid or **lessen the consequences of the [other party]'s wrong**." Sylva Shops Ltd. P'ship v. Hibbard, 623 S.E.2d 785 (N.C. Ct. App. 2006) (citation and internal quotation marks omitted; emphasis added). Construing the record in the light most favorable to the plaintiffs, there are genuine issues of material fact which preclude summary judgment for the defendant concerning the sale of the GT60 and the failure to sell the Azimut.

In the instant case, there is record evidence that Hatteras represented to Alcaras that the value of the Azimut was between $700,000 and $900,000 (DE# 24-3 at 46) and

that it may have been worth as much as $1 million dollars according to the Azimut's seller (DE# 29-2 at 33). Hatteras subsequently received an offer from a new buyer to purchase the Azimut for $500,000 (DE# 24-3 at 70), but did not sell it. Thus, there is a factual question as to the true value of the Azimut and consequently whether Hatteras acted reasonably when it sold the GT60 for $1,375,000 in cash plus the trade-in of the Azimut and whether it acted reasonably when it failed to liquidate the Azimut. Accordingly, based on this record, the reasonableness of Hatteras's efforts to mitigate its damages with respect to the sale of the GT60 and its failure to sell the Azimut should be submitted to the trier of fact.

### l.      Discounts Provided on the GT60 ($137,000)

The plaintiffs question whether the discounts provided by Hatteras in selling the GT60 to a new buyer were commercially reasonable. See Transcript November 4, 2014 Hearing (DE# 52 at 52, 11/14/14). However, the plaintiffs have provided no evidentiary support for this argument. Having failed to meet their burden, the defendant is entitled to summary judgment on the reasonableness of the $137,000 in discounts provided to the buyer of the GT60.

### m.      Lost Opportunity and Value of the GT60

In his interrogatory answers, Alcaras explained that he sought to recover "additional damages from the lost opportunity and value of the [GT60], which was sold below market value." Plaintiff Miguel Alcaras'[s] Answers to Defendant's First Set of Interrogatories (DE# 29-3 at 4, 10/14/14). To the extent Hatteras undersold the GT60 those damages will be addressed by the trier of fact and are covered under section "k" above. To the extent these damages are based on the plaintiffs' breach of contract

claim, Hatteras is entitled to summary judgment because Alcaras breached the Release Contract first.

In sum, Hatteras has not shown it is entitled to summary judgment on the following categories: (a.) broker fee ($100,000); (b.) interest ($51,799.49); (f) charge for engine upgrade ($92,000) and (k) failure to sell the Azimut ($700,000 - $900,000). Under North Carolina law, "the reasonableness of [the non-breaching party's] mitigation efforts depends on the circumstances of the particular case and is a jury question except in the clearest of cases." Reed Props., LLC v. Concentra Health Servs., Inc., No. 3:12CV691, 2014 WL 1512997, at *1 (W.D.N.C. Apr. 16, 2014) (citation and internal quotation marks omitted).

Accordingly, the undersigned respectfully RECOMMENDS that the Court grant in part Hatteras's request for summary judgment on the plaintiffs' breach of contract claim (Count I) and submit the issues outlined above to the jury.

## B.      Breach of Implied Covenant of Good Faith and Fair Dealing (Count II)

The defendant argues that it is entitled to summary judgment on the plaintiffs' claim of breach of implied covenant of good faith and fair dealing for three reasons: (1) no fiduciary or special relationship exists between the parties; (2) the facts underlying both the breach of contract claim (Count I) and the breach of implied covenant of good faith and fair dealing claim (Count II) are the same and (3) the defendant did not exhibit bad-faith conduct as a matter of law. See Hatteras's Motion for Summary Judgment (DE# 23 at 14, 9/26/14).

The plaintiffs argue that:

> North Carolina law is clear: a party **may** bring an action for breach of implied covenant of good faith and fair dealing brought it conjunction with an action for breach of contract. B. Lewis Prods., Inc. v. Angelou, 2005 WL 1138474, at *36 (S.D.N.Y. May 12, 2005) (noting that a claim for breach of the covenant of good faith and fair dealing and a breach of contract claim "should not be pursued separately"). Therefore, Hatteras'[s] misdirected recitation of the elements underlying an "independent" claim for breach of implied covenant of good faith and fair dealing is not only unsupported by North Carolina law, but also wholly inapplicable.

Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 18-19, 10/15/14) (emphasis in original). The plaintiffs further argue that whether Hatteras acted reasonably is a jury question.

The plaintiffs' reliance on  B. Lewis Prods., Inc. is misplaced. In that case, the district court dismissed as duplicative the plaintiff's separate cause of action for breach of implied covenant of good faith and fair dealing. B. Lewis Prods., Inc., 2005 WL 1138474 at *12.  In discussing North Carolina law,[15] the district court explained that:

> Although some courts in North Carolina have considered good faith and fair dealing claims separate from breach of contract claims, see, e.g., Eli Research Inc. v. United Communications Group, LLC, 312 F. Supp. 2d 748, 761 (M.D.N.C.2004), the weight of North Carolina authority holds also that a claim for breach of the covenant of good faith and fair dealing based on facts identical to those supporting a breach of contract claim should not be pursued separately. See, e.g., Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000) (citing Polygenex Int'l, Inc. v. Polyzen, Inc., 133 N.C. App. 245, 251, 515 S.E.2d 457, 461-62 (1999)); Mech. Indus. v. O'Brien/Atkins Assocs., P.A., No. 97 Cv. 99, 1998 U.S. Dist. LEXIS 5389, at *11 (M.D.N.C. Feb. 4, 1998) (noting that North Carolina recognizes a separate cause of action for breach of good faith and fair dealing only in limited circumstances involving special

---

[15] The parties in B. Lewis Prods., Inc. disputed whether New York law or North Carolina law governed their agreement. B. Lewis Prods., Inc., 2005 WL 1138474 at *4 n.4. The district court did not conduct a choice of law analysis because it determined that "[t]he fundamental principles of contract law" were valid in both states. Id.

relationships between the parties, such as cases involving funeral services and insurance contracts).

Id. at. 11. Similarly here, the plaintiffs are asserting a claim for breach of implied covenant of good faith and fair dealing (Count II) in addition to their breach of contract (Count I) claim. Thus, like in B. Lewis Prods., Inc., the plaintiffs' breach of implied covenant of good faith and fair dealing (Count II) claim is duplicative of its breach of contract (Count I) claim.

As succinctly explained by one court:

the North Carolina Supreme Court "has recognized that '[i]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" Murray v. Nationwide Mut. Ins. Co., 123 N.C. App. 1, 19, 472 S.E.2d 358, 368 (1996) (quoting Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985)). **Because the covenant of good faith and fair dealing is implied in a contract, however, a claim for breach of that covenant typically is "part and parcel" of a claim for breach of contract**. See id.; see also Thomas, Lord of Shalford v. Shelley's Jewelry, Inc., 127 F. Supp. 2d 779, 787 (W.D.N.C. 2000) (granting summary judgment on plaintiffs' claims for breach of contract and breach of implied covenant of good faith and fair dealing, noting that the latter was "part and parcel" of the former), aff'd, 18 F. Appx. 147 (4th Cir. 2001).

**Because the implied covenant is simply a contract term not expressly included in the agreement, in most cases a breach of the covenant is simply another way of stating a claim for breach of contract**. There are limited circumstances where a breach of the covenant of good faith would constitute a stand alone claim. See Meineke Car Care Centers v. RLB Holdings, LLC, No. 3:08CV240RJC, 2009 WL 2461953, at *11 (W.D.N.C. Aug. 10, 2009) ("North Carolina courts . . . do not consider breach of good faith claims independently from breach of contract claims unless there is a special relationship between the parties."). **Because [the defendant] did not have a special relationship with [the plaintiff], there is no basis for a separate claim for breach of the duty of good faith and fair dealing**.

ADA Liss Group (2003) v. Sara Lee Corp., No. 06CV610, 2010 WL 3910433, at *14 (M.D.N.C. Apr. 27, 2010) (footnote omitted; emphasis added).

It is only in instances where there is a fiduciary or special relationship between the parties that the plaintiff may assert a claim for breach of implied covenant of good faith and fair dealing independent from a breach of contract claim. B. Lewis Prods., Inc., 2005 WL 1138474 at *11. Here, the plaintiffs have put forth no evidence establishing a fiduciary or special relationship between the parties. At the hearing on the instant motion, the plaintiffs argued that because Hatteras was the custodian of the Azimut, an asset which the plaintiffs are looking towards to satisfy their damage claim, that this created a special relationship between the parties. See Transcript November 4, 2014 Hearing (DE# 52 at 38, 11/14/14).

The undersigned has found no case law to support the plaintiffs' argument that Hatteras's efforts to mitigate its damages (including its possession of the Azimut) creates a fiduciary or special relationship between the parties. The Supreme Court of North Carolina has stated that: "[t]hough difficult to define in precise terms, a fiduciary relationship is generally described as arising when there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." Dallaire v. Bank of Am., N.A., 760 S.E.2d 263, 266 (N.C. 2014) (citations and internal quotation marks omitted). The state supreme court cited examples of fiduciary relationships – the relationship between spouses, attorney and client, trustee and beneficiary and partners in a partnership – and noted that "[c]ommon to all these relationships is a heightened level of trust and the duty of the fiduciary to act in the best interests of the other party."

47

Id. Here, the record suggests that the Release Contract was an arms' length agreement and the product of months of negotiations between the parties. There is no indication on this record that a fiduciary or special relationship existed between Alcaras and Hatteras. Accordingly, the undersigned respectfully RECOMMENDS that the defendant's summary judgment motion be **GRANTED** with respect to the plaintiffs' breach of implied covenant of good faith and fair dealing (Count II) claim.

### C.    Unjust Enrichment (Count III)

Lastly, the defendant argues that it is entitled to summary judgment on the plaintiffs' claim of unjust enrichment (Count III) because: (1) there is a valid, express contract between the parties and (2) there was no benefit conferred to or accepted by the defendant. See Hatteras's Motion for Summary Judgment (DE# 23 at 17-19, 9/26/14). The plaintiffs maintain that their claim for unjust enrichment is based on circumstances not governed by the Release Contract because this claim "relates to Hatteras'[s] conduct in connection with the sale of the [GT60] as well as Hatteras'[s] failure to timely liquidate the [Azimut] to maximize its value." Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary Judgment (DE# 32 at 20, 10/15/14). The plaintiffs further argue that there are genuine issues of material fact concerning "whether it would be inequitable for Hatteras to have reaped the significant benefits of retaining possession of the [Azimut]" and "the amount of damages to which Alcaras is entitled." Id. at 21.

The plaintiffs acknowledge that "[u]nder North Carolina law, a plaintiff asserting an unjust enrichment claim must show it conferred a benefit on another, the other party consciously accepted that benefit, and the benefit was not conferred gratuitously."

48

Plaintiffs' Corrected and Amended Response to Defendant's Motion for Summary

Judgment (DE# 32 at 20-21, 10/15/14) (citing <u>Se. Shelter Corp. v. BTU, Inc.</u>, 572

S.E.2d 200, 206 (N.C. Ct. App. 2002); <u>Pan-Am. Prod. & Holdings, LLC v. R.T.G.</u>

<u>Furniture Corp.</u>, 825 F. Supp. 2d 664, 695 (M.D.N.C. 2011)). Regardless of whether the

plaintiffs' claim for unjust enrichment falls outside the Release Contract, the plaintiffs

have failed to show as a matter of law that they conferred a benefit upon the defendant

or that the defendant accepted that benefit. The plaintiffs state that their claim for unjust

enrichment is based on the sale of the GT60 and on the defendant's failure to timely

liquidate the Azimut. Specifically, at the hearing on the instant motion, the plaintiffs

explained their unjust enrichment theory as follows:

> [Counsel for Plaintiffs]: The A[z]im[u]t should be selling for $700,000.
>
> ***
>
> [Counsel for Plaintiffs]: If it sold for $500,000, [Alcaras] is out $200,000 based on what Hatteras said what the boat was worth and what the sale of the GT-60 was worth. Hatteras is not entitled to be benefitted by that amount.
>
> ***
>
> [Counsel for Plaintiffs]: The benefit is that [Hatteras does not] have to pay the $200,000. [Hatteras] told [Alcaras] that they [we]re going to sell the [GT60] for 2.6 million, and if they s[old] it for far less, then they don't have to pay the difference.

<u>See</u> Transcript November 4, 2014 Hearing (DE# 52 at 53-54, 11/14/14).

Neither the sale of the GT60 nor the non-sale Azimut have unjustly enriched the

defendant. The undisputed record evidence is that the defendant tendered a check to

Alcaras in the amount of  $72,724.22 (the difference between the amount owed by the

Alcaras on the GT60 and purchase price paid by the new owner). With respect to the

Azimut, Hatteras has attempted to transfer title to Alcaras and there was also a failed

attempt to sell the vessel for approximately $500,000. Alcaras has refused to cash the

49

check or to agree to the sale of the Azimut. Based on these facts, the plaintiffs cannot show that Hatteras has been unjustly enriched as a matter of law. Accordingly, the undersigned respectfully RECOMMENDS that the Court enter summary judgment in favor of the defendant on the plaintiffs' unjust enrichment claim (Count III).

## RECOMMENDATION

In accordance with the foregoing, Hatteras is entitled to summary judgment in its favor on the plaintiffs' claims for breach of implied covenant of good faith and fair dealing (Count II) and unjust enrichment claim (Count III). The defendant is also entitled to partial summary judgment on the breach of contract claim (Count I) because it did not breach the Release Contract as a matter of law. Genuine issues of material fact remain concerning whether Hatteras acted reasonably in mitigating its damages. Accordingly, the undersigned respectfully recommends that Hatteras's Motion for Summary Judgment (DE# 23, 9/26/14) be **GRANTED in part and DENIED in part**.

The parties have fourteen (14) days from the date of receipt of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Federico A. Moreno, United States District Court Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. See LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this **25th** day of November, 2014.

_____
JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
United States District Judge Moreno
All Counsel of Record